RICHARD SEWARD ET AL., APPELLANTS, V. MICHAEL
DANAHER, GUARDIAN, APPELLEE.

FILED MARCH 11, 1921.   No. 21311.

1. Guardian and Ward: INVESTMENTS BY GUARDIAN.  An approval by
   the county court, without notice to those interested, of a guardian's
   application to invest his ward's funds is not conclusive upon the
   ward of either the propriety or safety of the investment or of the
   reasonableness of the terms or rate of interest.  *In re Estate of
   O'Brien,* 80 Neb. 125, followed.

2. ———: ———: INTEREST.  After a guardian has fully accounted
   for the principal of the funds of his ward invested by him, he is
   chargeable only with such a reasonable rate of interest thereon
   as he could have secured by the exercise of reasonable diligence
   and with due regard to the safety of the investment and with
   scrupulous fidelity to his trust; but he is always chargeable with
   the interest actually received by him.

3. ———: ———: ———.  There is no rule in this state requiring a
   guardian to account for the legal rate of interest upon his ward's
   funds invested by him, where he has actually received less, and
   where there has been no breach of his duty as guardian.  *In re
   Estate of O'Brien,* 80 Neb. 125, and *Wilson v. Wilson,* 90 Neb.
   353, distinguished.

4. ———: ADMINISTRATION OF TRUST: EVIDENCE.  Evidence examined,
   and *held* that the guardian had properly administered his trust,
   and that there was no ground for his removal from his office and
   trust as guardian.

APPEAL from the district court for Butler county:
GEORGE F. CORCORAN, JUDGE.  *Affirmed.*

*Roper & Shaw* and *George A. Adams,* for appellants.

*Hastings & Coufal, contra.*

CAIN, C.

This is a suit for an accounting brought against Michael
Danaher, guardian of the estate of Bernard Seward and
Leo C. Seward, minors, by their father, Richard Seward,
and his niece, Kittie F. Noonan.  The amount for which
judgment was asked aggregates about $3,600.  Removal

of the guardian was also asked because of his alleged un-
lawful and negligent acts in handling the trust funds of
his wards.   The defendant was appointed guardian on
July 6, 1909, and this suit was begun on May 5, 1919, so
that it relates to the administration of his trust for a
period of about 10 years.   The funds of these minors
which came into the hands of the defendant guardian and
which was their 2/33 interest in the estate of their de-
ceased grandfather, John Danaher, amounted to $6,311.96.
The guardian filed a true, but unsigned, inventory on Jan-
uary 28, 1910, showing his receipt of the above amount and
the source from which it was derived.   Appellants criti-
cise the informality of this inventory, but, as the record
shows that they referred to it in their petition, making it
the basis of their suit, and as their counsel himself offered
it in evidence, together with all other files in the guardian-
ship matter, and as its accuracy is not questioned, we treat
it and all other filings as authentic.   Moreover, the guar-
dian's undisputed testimony is that the inventory was ac-
curate and that it set forth all the funds of his wards that
came into his hands.   It is established and admitted that
the guardian has accounted for the entire principal sum
received by him, with interest thereon at 5 per cent. per
annum.   The grounds of the wards' suit are as follows:
(a) They seek to charge their guardian with the difference
between the 5 per cent. interest actually received by him
and 7 per cent., the "going rate" of interest on personal
unsecured loans, or with the legal rate.   This is the prin-
cipal item of their claim and amounts to about $2,100.,
(b) That the guardian erroneously paid Daniel Danaher
$225 for board and care of the minors and $15 for their
clothing which was furnished before his appointment, and
it is claimed that there was an agreement that no charge
was to be made therefor.   (c) That, if the guardian had
loaned these funds upon tax free mortgages, he would have
saved $465.05 paid for taxes.   (d) The guardian paid
Agnes Donohoe $315 for the care and support of these
minors, and it is claimed that, as their father had suffi-

cient income from his farm and residence properties in Seward county to pay this item, the guardian should not receive credit therefor. (e) That the guardian was not entitled to the compensation of $215.29 received by him. (f) Other small items aggregating $8.33 were charged to the guardian in the petition.

Immediately after the guardian had filed his inventory showing that he had $6,311.96 of his wards' funds in his hands, he filed in the county court a written application to be empowered to invest as. much thereof as was not required for the minors' support. Upon this application, on January 28, 1910, the court made an order, reciting that the guardian was present in court personally and by his attorney, Arthur J. Evans, and authorizing the guardian to loan $2,000 of the funds to his brother, James Danaher, and $4,000 thereof to the guardian himself. This the guardian did, taking personal notes therefor. Thereafter, during the 10 years, he annually reloaned the funds to his brothers and to himself, taking notes therefor, always at 5 per cent. interest.

The guardian and his brothers each owned a Butler county farm worth $200 an acre and were financially responsible. All loans were repaid with interest. Richard Seward, father of these minors, was himself under guardianship from 1912 to the time of the trial. On January 28, 1911, the guardian filed with the county judge an application to be authorized to loan $4,000 to John Danaher and $2,000 to Michael Danaher, each at 5 per cent. interest, and on February 8, 1911, the court made an order authorizing these loans on the terms stated. On February 6, 1912, the guardian filed his annual report. On February 28, 1913, the guardian filed application to loan $3,486.65 to James Danaher and the remainder to himself, all at 5 per cent., interest, and the court authorized the loans upon the terms named and directed the guardian to take the personal notes of the borrowers therefor. Verified annual reports were filed by the guardian of all his acts, and setting forth to whom the several loans were made

and the interest derived therefrom. On February 27, 1919, the guardian was authorized to loan $6,000 to himself on second mortgage at 5½ per cent., and this was done. In none of these applications was any notice of any kind given to any one. Appellants claim in their brief that the guardian made 17 different loans to himself and brothers without any authority whatever from the court, and that the 10 other loans made by him were pursuant to *ex parte* orders of the county court, and we think the statement is true. We do not think that these *ex parte* orders of the county court altered the liability of the guardian for the funds of his wards. In the case of *In re Estate of O'Brien*, 80 Neb. 125, this court held:

"Section 27, ch. 34, Comp. St. 1907 (Rev. St. 1913, sec. 1654) requires a guardian to apply to and receive from the county court an order authorizing him to loan the funds of his ward. If he loans his ward's funds without such authority, and a loss ensues, he is liable therefor. * * * The approval by the county court, without notice to those interested, of the usual annual reports of a guardian, wherein he reports loans of his ward's funds without an order of the court, is not equivalent to an order of the court authorizing the guardian to make such loans." In the body of the opinion in that case this court said: "Reference to the section of the statute above quoted will disclose that it was the intention of the legislature that there should be a hearing before the court and notice given to those interested, that an investigation as to the desirability of the proposed loans should be had before the court, that evidence might be taken upon this question of those qualified to give an opinion, and that the court, after hearing the evidence, should render a judicial act in directing or refusing the order to make the loans."

But, though these *ex parte* orders of the county court do not change the extent of the guardian's liability in this case, the filing of his applications therefor and his comprehensive annual reports show at least his good faith in the premises. He testified that he acted under the

advice of his attorney, Judge Evans, until the latter's
death in 1913, and thereafter under the advice of other
attorneys, and that he kept the father of these minors ful-
ly informed of these loans, and that there was no criticism
upon his acts until the commencement of this suit. The
appellants earnestly contend that the guardian should be
charged with 7 per cent., the legal rate of interest on these
funds, citing *In re Estate of O'Brien,* 80 Neb. 125, and
*Wilson v. Wilson,* 90 Neb. 353, in support of their con-
tention. But both these cases may be readily distinguished
from the case at bar. In the *O'Brien* case, the guardian
loaned his ward's funds on personal direction of the coun-
ty judge, but upon mortgage security that was wholly in-
sufficient, and there was a total loss of the funds, while
in the instant case there was no loss of either principal or
interest of the funds at all. In the *O'Brien* case, the court
had no basis for fixing the rate of interest except by adopt-
ing the legal rate, while in the instant case the rate of in-
terest was stipulated when the loans were made, and the
sole question is whether it was the guardian's duty to ob-
tain the usual rate of interest received by banks on 'per-
sonal unsecured loans, which then was 7 per cent. In
the *Wilson* case, *supra,* there was a conversion of the
ward's funds by the guardian, and, as there was not even
a pretense of a loan, and, hence, no stipulated rate, the
court had to resort to the legal rate of interest in requir-
ing the guardian to account. Also, the authorization by
the court did not enter into that decision, since obviously
the court could not authorize a tortious act, and the refer-
ence in the opinion to the lack of authorization by the
court is clearly an inadvertence. In both these cases there
was a clear breach of trust by the guardian. Neither of
them sustain appellants' contention that the lack of a
valid order of the county court authorizing the guardian to
make the loans fixing the rate of interest necessarily sub-
jects him to the payment of the legal rate of 7 per cent.
when he actually received only 5 per cent. It seems that it
is only where the guardian has been guilty of some distinct

breach of his trust, such as failure or unreasonable delay to invest his ward's funds, or intermingling them with his own, or a neglect to settle his accounts for a long time, that he is chargeable with the legal rate of interest. 1 Perry, Trusts and Trustees (6th ed.) sec. 468; 21 Cyc. 93. Here the guardian was derelict in none of these particulars. He safely invested his wards' funds, did not intermingle them with his own, and made regular, full and true reports of his doings. But appellants insist that 7 per cent. was also the "going rate" of interest at banks on "personal unsecured loans" during the time in question, and that, therefore, the guardian could have secured and should be required to pay that rate. No authority is cited to sustain this contention beyond the general rule that it is a guardian's duty to render the trust estate as productive as possible consistent with safety.

Passing, for the moment, the obvious and vital fact that this defendant was not a banker, but was a farmer without facilities for ascertaining the demand for or safety of such loans, we address ourselves to a consideration of the measure of a guardian's duty in obtaining a rate of interest upon his ward's funds. For what rate of interest must the guardian account? Is it the highest rate of interest obtainable by lenders of money having complete facilities and large experience in the making of safe loans, or is it such a reasonable rate as a person of ordinary intelligence and vocation could secure, with reasonable diligence and with scrupulous fidelity to his trust? The general rule is laid down in 39 Cyc. 425, thus: "The first general rule covering the accountability of a trustee is that he shall not make a profit for himself out of the trust estate; and this rule subjects him to an account for all the interest which he actually makes and receives, but ordinarily he should not be charged with more than he actually receives, or in the proper exercise of his duties should have received."

Section 1651, Rev. St. 1913, is as follows:

"Every guardian shall manage the estate of his ward frugally and without waste, and apply the income and profit thereof, as far as may be necessary, for the comfortable and suitable maintenance and support of the ward and his family, if there be any, and if such income and profits shall be insufficient for that purpose, the guardian may sell the real estate, upon obtaining a license therefor, as provided by law, and shall apply the proceeds of such sale, as far as may be necessary, for the maintenance and support of the ward and his family, if there be any."

Tested by either the general rule or the statutory rule above set out, is the guardian chargeable with the 2 per cent. interest above what he actually received? The evidence is that, during the period involved herein, the usual or "going rate" of interest on first mortgage loans was 5 per cent. per annum, and upon "personal unsecured loans" was 7 per cent. at the banks. But the guardian did not have either the facilities or information of a banker or other money lender, and the statute does not require that he have. If he had secured the assistance of some one having the special skill and facilities of those engaged in that business, he probably would have had to pay enough for the service to reduce the net amount below what he himself actually received. One illustration of the cost of this service is the difference between the rate of interest paid on time deposits at a bank, which at this time was 4 per cent., and the rate of interest at which the bank loans the same money. This would probably amount to 3 per cent. at the then lending rate of 7 per cent., and could not be less than 2 per cent. as, under our statute, 5 per cent. is the maximum rate that banks are allowed to pay on time deposits. In either case, the defendant would not have realized more than 5 per cent. Nor do the loans he made fairly come within the designation of "personal unsecured loans." The Danaher boys were sufficiently well to do so that loans to them were as safe as if they had been secured by first mortgage on real estate. Then, too, in order to realize 7

per cent, the loans likely would have had to be on short time, and there might have been intervals during which the principal was earning no interest. We think that the true rule is that, after a guardian has fully accounted for the principal of the funds of his ward invested by him, he is chargeable only for such a reasonable rate of interest thereon as he could have secured by the exercise of reasonable diligence and with due regard to the safety of the investment, but always is chargeable with the interest actually received by him. 39 Cyc. 425; *Gott v. Culp,* 45 Mich. 265; *In re Estate of Wisner,* 145 Ia. 151; *Taylor v. Hite, Curator,* 61 Mo. 142; *Vaccaro v. Cicalla,* 89 Tenn. 63; *Stevens v. Meserve,* 73 N. H. 293, 111 Am. St. Rep. 612; *Slauter v. Favorite, Guardian,* 107 Ind. 291. And, in our opinion, the defendant guardian's conduct in this case measured up to that rule, and he is not chargeable with more interest than he actually received. If there had been notice to all of his several applications to the court and full hearing thereon, and seasonable objection had been made to loaning to himself and brothers, it is reasonable to suppose that the court would have ordered the funds deposited in a bank at 4 per cent. or loaned on first real estate mortgage at 5 per cent. In either case, no more interest would have been realized for the wards. It follows, too, that the wards' claim for taxes paid was properly disallowed. Finally, on this point, appellants claim that the guardian "profited" by the loans to himself by getting the money at 5 per cent. instead of 7 per cent. which he would have had to pay at the bank. The evidence does not support this claim. The guardian could and probably would have mortgaged his farm and got the money at 5 per cent. rather than pay 7 per cent. at the bank.

We now consider the guardian's claim for a credit of $315 for money paid to his sister, Agnes Donohoe, on January 11, 1916, for the support of these minors from April 1, 1914, to January 1, 1916, a period of 21 months. These children were in the custody of Agnes Donohoe from

October 8, 1913, to January 6, 1919, and their father, Richard Seward, paid for their support all that time, except for the 21· months referred to. The merits of the claim are not questioned, but it is contended that the minors' father was liable to pay it, and that the guardian unlawfully paid it out of the wards' funds and should not receive credit for it. The mother of these wards was in an insane asylum, their father was under guardianship as an incompetent, his guardian lived in Seward county, and it is stipulated that the wards had no cash to pay this claim at the time, and that this defendant guardian paid it, and, after the claim was filed and allowed against this estate, that he reimbursed himself to the amount of the claim for the advancement. We see nothing wrong in this, especially in view of our statute which expressly provides that the guardian shall apply as much of the income of his ward's estate as may be necessary for his comfortable and suitable maintenance and support. Rev. St. 1913, sec. 1651. The immediate necessities of the wards required that their guardian pay this claim, and he is entitled to credit therefor.

Objection is made to the guardian's payment of $240 to Daniel Danaher for board and care and clothing of one of these minors from November 7, 1907, to February 15, 1909, a period of about 15 months. The grounds of the objection are that this indebtedness was incurred before defendant's appointment as guardian, and that there was an understanding that no charge would be made. But there is no evidence that Daniel Danaher himself ever represented that he would make no charge, even if that were decisive of the justness of the claim. And we perceive no reason why the date of the guardian's appointment affects the validity of the claim. It is the income from the ward's estate which the statute directs shall be devoted to his support, and no distinction is made as to whether the claim for that support is incurred before or after the appointment of a guardian. The objection to this claim is untenable. The objection to the small items aggregating $8.33 is likewise without merit.

A careful examination of the record in this case persuades us that the defendant guardian managed the estate of the plaintiff wards "frugally and without waste" as our statute provides, and that they have no just cause for complaint. It follows that his claim for $215.29 for compensation for his services extending over a period of ten years is reasonable and just and its allowance is warranted by section 1665, Rev. St. 1913. And it also follows that there is no cause for his removal as guardian.

In our opinion, the judgment of the district court approving the accounting made in the county court of Butler county and dismissing the wards' complaint and finding in favor of the defendant should be affirmed, and we so recommend.

PER CURIAM. For the reasons stated in the foregoing opinion, the judgment of the district court is affirmed, and this opinion is adopted by and made the opinion of the court.

AFFIRMED.